**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| CHRISTOPHER HARBORNE, AML GLOBAL LTD. (BVI), AML GLOBAL LTD. (HK), AML GLOBAL (HK) LTD., and AML GLOBAL PAYMENTS LLC, | ) ) ) ) ) | C.A. No. N24C-02-292 KMM |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DOW JONES & COMPANY, INC. d/b/a THE WALL STREET JOURNAL, | ) ) ) | |
| Defendant. | ) | |

Submitted: October 11, 2024
Decided: December 23, 2024

## MEMORANDUM OPINION AND ORDER

*Plaintiffs' Motion to Convert – **DENIED**.*
*Defendant's Motion to Dismiss – **DENIED**.*

Brian E. Farnan, Esquire, Michael J. Farnan, Esquire, Farnan LLP, 919 N. Market Street, 12th Floor, Wilmington, Delaware, Elizabeth M. Locke, Esquire, (argued) Jered T. Ede, Esquire, Clare Locke LLP, 10 Prince Street, Alexandria, Virginia, *attorneys for plaintiffs*.

Daniel M. Kirshenbaum, Esquire, Young Conaway Stargatt & Taylor, LLP 1000 North King Street, Wilmington, Delaware, Katherine M. Bolger, Esquire, (argued), Abigail Everdell, Esquire, Davis Wright Tremaine LLP, 1251 Avenue of the Americas, 21st Floor, New York, New York, *attorneys for defendant*.

**Miller, J.**

# I.    INTRODUCTION

Christopher Harborne ("Harborne") is an international businessman, owning and investing in several successful businesses.  He was an early investor in cryptocurrency, and became an active trader on the Bitfinex cryptocurrency exchange.  While Harborne owned 12% of Bitfinex and its sister company Tether, he was not involved with either company, except as a minority stakeholder.

The Wall Street Journal ("Journal") published an article in 2023 about Bitfinex's and Tether's difficulties maintaining access to the global banking system in light of fraud and money laundering allegations.  The article detailed how these companies used falsified documents, "shadowy intermediaries," and shell companies to open bank accounts around the world, including at Signature Bank. Signature Bank ultimately closed the accounts and later attempts by Tether and Bitfinex to open new accounts were rejected, due to the allegations against them.

The article then turned to Harborne, reporting that after Tether and Bitfinex were turned down by Signature Bank, the bank was "then introduced" to Harborne and his company AML Global.  The article stated that Harborne opened an account for his company at Signature Bank, but the application did not say that he owned 12% of each of Bitfinex and Tether under the name Chakrit Sakunkrit.  The article also stated that the Sakunkrit name appeared on Signature Bank's list of those the bank felt "were trying to evade anti-money laundering controls."   The article

1

described Signature Bank executives questioning the source of funds into AML Global's account. The bank then "soon closed" the account.

Harborne and his companies brought this action asserting defamation against the Journal's publisher, Dow Jones & Company, Inc. ("Dow Jones").[1] Plaintiffs allege that the gist of the article was that Harborne and his companies engaged in Bitfinex's and Tether's scheme to defraud banks. Plaintiffs claim that the gist was false – Harborne never opened an account for Bitfinex or Tether, nor did he engage in a scheme to defraud banks. But because of the article, Harborne and his company were injured as the market perceived the article to accuse him of such behavior.

Dow Jones moved to dismiss under Rule 12(b)(6), attacking the complaint's allegations of falsity and actual malice. Construing the complaint and drawing all reasonable inferences in plaintiffs' favor, the Court finds that the complaint adequately pleads falsity and actual malice. The Motion to Dismiss is **DENIED**.

## II. FACTUAL BACKGROUND[2]

### A. *Harborne and his companies*

#### 1. *Harborne's businesses*

Harborne is a businessman and technology investor. He holds dual citizenship in Great Britian and Thailand, where he has lived and worked for over 20 years.[3]

---

[1] D.I. 1 (Complaint), p. 1, n. 1.
[2] The facts are derived from the allegations in the complaint.
[3] D.I. 1, ¶ 9.

When he became a naturalized Thai citizen, Harborne was required to adopt a Thai name.[4] He chose Chakrit Sakunkrit. He uses his Thai name for legal purposes in Thailand and uses his birth-name outside Thailand.[5]

Harborne owns several companies, employing over 600 people around the world, including plaintiffs AML Global Ltd. (BVI), AML Global Ltd. (HK), AML Global (HK) Ltd. (collectively "AML Global"), and AML Global Payments LLC ("AML Global Payments"). AML Global is an international jet fuel broker that works with oil companies, aviation fuel traders, intro-plane agents, and specialist aviation fuel suppliers.[6] Harborne built a successful business. AML Global has been awarded $39 million in U.S. Department of Defense contracts. Through AML Global,[7] Harborne expanded into the aerospace and financial payments sectors. AML Global Payments handles incoming and outgoing payments for AML Global's operations.[8]

### 2. *Harborne invests in cryptocurrency*.

Harborne was an early investor in Bitcoin and other cryptocurrencies.[9] Tether, which trades on the Tether exchange, is the most widely traded cryptocurrency. Because it is a stablecoin tied to the U.S. dollar, it is more predictable than other

---

[4] *Id.*
[5] *Id.*, ¶ 33.
[6] *Id.*, ¶ 21.
[7] *Id.*, ¶ 23.
[8] *Id.*
[9] *Id.*, ¶ 22.

3

types of cryptocurrencies.[10] Investing in cryptocurrencies, including tether, is a recognized strategy to hedge against the volatility of foreign currencies.[11]

Bitfinex is a cryptocurrency exchange platform that trades units such as Bitcoin.[12] Although he did not own any Bitcoin, Harborne was an active trader on the Bitfinex platform. In 2016, Bitfinex suffered a hack through which Bitcoins were stolen.[13] As a result, Bitfinex issued "BFX" crypto tokens to traders, including Harborne.[14] Harborne saw the tokens as a risky, yet potentially high-reward investment, so he purchased BFX tokens on the secondary markets.[15] Eventually, Bitfinex converted the BFX tokens to equity, and Harborne became a "minority shareholder of Bitfinex with a roughly 12% ownership stake in the exchange."[16] Harborne never held a management or executive position with Bitfinex.[17]

**B.** ***AML Global Payments opens an account at Signature Bank.***

In 2018, Signature Bank began accepting "crypto exchanges and stablecoin issuers as clients," making the bank one of the "'preeminent player[s] in that space.'"[18] In November 2018, AML Global Payments contacted Signature Bank

---

[10] *Id.*, ¶ 27.
[11] *Id.*, ¶ 29.
[12] *Id.*, ¶ 28.
[13] *Id.*
[14] *Id.* The tokens were essentially a "digital IOU" that could be cashed in if the lost tokens were recovered.
[15] *Id.*, ¶ 29.
[16] *Id.*, ¶ 29.
[17] *Id.*
[18] *Id.*, ¶ 32.

4

about opening an account. It followed the bank's standard application process: the bank sent its due diligence package and AML Global Payments responded to the inquiries.[19] AML Global Payments disclosed that the account would be used to transact trades on Kraken, an exchange similar to Bitfinex, and that Harborne also uses the Sakunkrit name (and explaining why).[20] After Signature Bank reviewed and approved AML Global Payments' application documents, it formally applied for an account in January 2019, which the bank then opened.[21]

Shortly after opening the account, AML Global Payments funded it with a $10,050,000 wire transfer from Kraken, which "served as the sole source of funding for the account."[22] Between February and May 2019, additional funds were deposited in the account from Kraken and transfers out of the account were made to AML Global Payment's accounts at other banks. The Signature Bank account was never used for Tether or Bitfinex.[23]

On May 8, 2019, Signature Bank sent AML Global Payments an account closure notice. The bank wrote:

> Subject to no material change occurring with respect to the account(s) prior to the above-stated date [], as a courtesy to you

---

[19] *Id.*, ¶ 33.
[20] *Id.* ("Christopher Harborne has been a long-term resident of Thailand (20+ years) and acquired Thai nationality in 2011 by naturalization, which requires adoption of a Thai Language name. He is required to use the Thai name for legal purposes in Thailand but is not required to abandon his original birth name which he continues to use outside Thailand.").
[21] *Id.*, ¶ 35.
[22] *Id.*
[23] *Id.*

5

and in an effort to permit you enough time to establish another relationship, the Bank will permit transactions on this account until May 22nd 2019. ... This should afford you sufficient time to make other arrangements to handle your banking needs.[24]

## C. *The Journal publishes the February Article.*

On February 2, 2023, the Journal published an article by Ben Foldy ("Foldy"), Ada Hui, and Peter Rudegeair, titled "*The Unusual Crew Behind Tether, Crypto's Pre-Eminent Stablecoin*" (the "February Article").[25]  This article reported on Tether and profiled its founders and certain executives, describing them as "an unusual bunch with scant experience."[26]  Even though Harborne was not an executive of Tether or Bitfinex, the article described how Harborne came to own a "roughly 10-12% stake in both Bitfinex and Tether."[27]  The article reported that "AML Global"

---

[24] *Id.*, ¶ 37.
[25] *Id.*, ¶ 39; https://www.wsj.com/articles/tether-ownership-and-company-weaknesses-revealed-in-documents-11675363340.
[26] D.I. 1, ¶ 40.
[27] *Id.*, ¶ 41.  The Journal contends that Harborne is a "principal" of Bitfinex based on the company's registration with the Securities Commission of the Bahamas, which identifies Harborne as such. Harborne alleges that the registration requires disclosure of owners of 10% or more of the voting securities, but that he had no control over the entity. He was nothing more than a minority owner. *Id.*, p. 22, n. 25.

was an independent aircraft refueling agent, which had received approximately $39 million in contracts with the U.S. Department of Defense.[28]

## D. *The Journal publishes the March Article.*

On March 3, 2023, the Journal published an article by Foldy and Ada Hui, titled "*Crypto Companies Behind Tether Used Falsified Documents and Shell Companies to Get Bank Accounts*" (the "March Article"). The March Article began by noting that those behind "the most widely traded cryptocurrency were struggling to maintain their access to the global banking system," so their backers "turned to shadowy intermediaries, falsified documents and shell companies" to gain access to bank accounts.[29] The article went on to describe a major tether trader who was "trying to 'circumvent the banking system by providing fake sales invoices and contracts for each deposit and withdraw.'"[30] An owner of Tether recommended abandoning this strategy because he "'would not want to argue any [of these practices] in a potential fraud/money laundering case.'"[31]

Not having access to the global banking system was an "existential threat" to Tether and Bitfinex, the March Article continued. According to a "cache of emails and documents" reviewed by the Journal, Tether and Bitfinex used other companies

---

[28] *Id.*, ¶ 42. Other than insulting Harborne's character, plaintiffs do not take issue with this article.
[29] *Id.*, Ex. A.
[30] *Id.*, ¶ 71.
[31] *Id.*, Ex. A.

and individuals (some of which had ties to a "designated terrorist organization") to open accounts for them. As a result of this scheme, authorities seized "hundreds of millions of dollars of … assets."[32]

The March Article reported that Tether's need to maintain access to bank accounts grew urgent in 2017, when Wells Fargo "stopped processing transactions from several Taiwanese accounts that Tether was using."[33] To calm users, Tether's chief strategy officer said on a call a few weeks later, that Tether and Bitfinex "always found a solution" to the banking issue and that "'[t]here's been lots of sort of cat-and-mouse tricks that everyone in the industry has to avail themselves of.'"[34] The March Article went on to describe instances where bank accounts were opened for the companies by established business executives who used fictitious company names, and that one such account was allegedly used to launder money for a Hamas organization.[35] The Department of Justice seized more than $1 million from another Bitfinex account that was being used by a black-market money transmitting business.

The March Article also reported on other questionable Bitfinex transactions, including the transfer of more than $1 billion to a "Panama-based payment

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*, Ex. A.

processor," that was known for using shell companies to open bank accounts, despite no written agreement between the entities. By October 2018, U.S. and European authorities uncovered the scheme and "$850 million of [Tether's and Bitfinex's] funds were seized." Bitfinex had to borrow funds from Tether to "cover the hole in its balance sheet."[36]

Tether and Bitfinex were able to open nine bank accounts in Asia over nine days in October 2018, the article continued. Customers were urged to keep these new banking relationships quiet because revealing the information "'could damage not just yourself and Bitfinex, but the entire digital token ecosystem.'"[37]

In 2018, Tether and Bitfinex also opened accounts at Signature Bank, the Journal reported, which the bank promptly closed. Signature Bank rejected the companies' attempt to open another account later in 2018. The March Article then turned its attention to Harborne, reporting:

> Signature bankers were then introduced to a company called AML Global, an aviation fuel broker that was looking to open an account.
>
> The account would be controlled by Christopher Harborne, according to the application, which said it would be used to trade cryptocurrency primarily on a well-known exchange called Kraken for the purposes of hedging currency exposure. Mr. Harborne is a major backer of Brexit and the U.K.'s Conservative Party and owns AML Global.
>
> The application didn't say that Mr. Harborne owned roughly 12% of both Tether and Bitfinex under another name, Chakrit Sakunkrit. The

---

[36] *Id.*

[37] *Id.*

9

Sakunkrit name had earlier been added to a list of names the bank felt were trying to evade anti-money-laundering controls when the companies' earlier accounts were closed, but Mr. Harborne's hadn't.

Compliance executives questioned why an account that was supposed to be trading on Kraken was getting huge inflows from what appeared to them as Bitfinex. "Bitfinex was not mentioned anywhere in the paperwork that was provided," one Signature executive wrote, according to the documents. "If they are buying/selling with Kraken, why is the money only coming in from Bitfinex?"

The account for AML was provisionally opened but soon closed after the bank realized the account was connected to Bitfinex, according to people familiar with the matter. Mr. Harborne didn't reply to a request for comment.[38]

### E. *The media reacts to the March Article.*

Within days of the article being published, a prominent opinion columnist at Bloomberg posted an article describing the March Article as accusing "AML"[39] of "lying to act as a front for a crypto exchange."[40]

Another website's report said, that had Harborne disclosed his "second identity" (Sakunkrit), Signature Bank "likely would have … rejected" it because Sakunkrit's name had previously been added to "'a list of names the bank felt were

---

[38] *Id.*, Ex. A (the "Last Five Paragraphs").
[39] At times, the complaint and the briefs refer to "AML" without identifying a specific entity. The Court adopts this nomenclature unless the name of the specific AML entity is relevant.
[40] D.I. 1, ¶ 110.

trying to evade anti-money-laundering controls.'"[41]  Similar articles appeared on other websites, as well as social media sites.[42]

**F.      *Harborne demands a retraction.***

After months of attempting to mitigate the damage from the March Article, Harborne sent a letter to the Journal on December 13, 2023, "outlining the numerous falsehoods" in the article, offering to meet to answer any questions, and demanding a retraction.[43]  The Journal rejected Harborne's offer, and "attempted to defend the [March] Article by ... claiming that it did not accuse Mr. Harborne and AML of any wrongdoing."[44]  The Journal further responded that it did not "state or imply" that Harborne and his companies were "shadowy intermediar[ies] or shell compan[ies]" or that AML falsified documents or used the Signature Bank account for the "benefit of Tether or Bitfinex."[45]

On January 17, 2024, Harborne sent another demand for a retraction.[46]  A few weeks later, Harborne met with Foldy, other Journal employees, and its counsel.[47]

---

[41] *Id*., ¶ 111.
[42] *Id*., ¶¶ 112-15.
[43] *Id*., ¶ 104.
[44] *Id*., ¶ 106.
[45] *Id*.
[46] *Id*., ¶ 116.
[47] *Id*., ¶ 120.

Harborne presented documents that showed the allegations in the March Article were "categorically and demonstrably false."[48]

Only after the threat of litigation did the Journal removed the Last Five Paragraphs of the March Article and republished it on February 21, 2024, with the following editor's note:

> *A previous version of this article included a section regarding Christopher Harborne and AML Global, which applied for an account at Signature Bank. The section has been removed to avoid any potential implication that AML's attempt to open an account there was in any way a part of an effort by Bitfinex or Tether to mislead banks, or that Harborne or AML withheld or falsified information during the application process.*[49]

The Journal did not, however, publish the new version as widely as it published the original article.[50] Additionally, the Journal's *Factiva* site continued to carry the original version of the article.[51]

---

[48] *Id.*
[49] *Id.*, ¶ 124.
[50] *Id.*, ¶¶ 125-26.
[51] *Id.*, ¶ 130.

Harborne contacted the Journal on February 25, 2024, expressing dissatisfaction with the editor's note. Shortly thereafter, he filed the complaint.[52]

## G.      *The complaint*

The complaint asserts three counts: Count I – Defamation (Harborne); Count II – Defamation by Implication (Harborne); and Count III – Defamation by Implication (the AML Global entities and AML Global Payments).

In Count I, Harborne alleges that the statement in the March Article that: "The Sakunkrit name had earlier been added to a list of names the bank felt were trying to evade anti-money-laundering controls when the companies' earlier accounts were closed"[53] is defamatory. Harborne asserts that a reader would understand this statement to mean that he attempted to evade anti-money-laundering controls.[54]

---

[52] *Id.*
[53] *Id.*, ¶ 155.
[54] *Id.*, ¶ 157.

Harborne alleges the March Article was false because he never attempted to evade anti-money-laundering controls and his name was never on such a list.[55] To support his claim of falsity, Harborne also alleges:

- Signature Bank allowing the account to remain open for weeks after the closure notice is inconsistent with it suspecting Harborne of committing fraud or money-laundering.[56]

- The March Article misidentified "AML Global" as an "aviation fuel broker" when the Journal knew the jet fuel entities never applied for an account at Signature Bank; AML Global Payments submitted the application.[57]

- Contrary to the March Article's inference, Harborne *did* disclose his Thai name.

- Contrary to the article's inference that Harborne failed to disclose his ownership interest in Bitfinex and Tether,[58] the application did not ask

---

[55] *Id.*, ¶ 158.
[56] *Id.*, ¶¶ 36-38, 67.
[57] *Id.*, ¶ 78.
[58] *Id.*, ¶ 81.

about Harborne's ownership interests nor did the bank request additional information, despite Harborne's offer to provide it.[59]

- The March Article reported that the Signature Bank account was closed when bank employees realized it was being used for "huge inflows from what appeared to them to be Bitfinex." But, as the Journal knew, the account was used only for Kraken.[60]

- Contrary to the March Article's implication, AML Global Payments was not a "shadowy intermediary" for Tether and Bitfinex, which the Journal later acknowledged.[61]

- The Journal knew Harborne was not an executive of Bitfinex or Tether and that he did not control either company; he simply held a minority stake in each.[62] Yet, the article implied he was an executive who tried to open accounts for the companies.

- The March Article also implied that AML was a "shell" used to facilitate Tether's and Bitfinex's "illicit attempts to gain access to the

---

[59] *Id.*, ¶ 82.
[60] *Id.*, ¶ 84.
[61] *Id.*, ¶ 86.
[62] *Id.*, ¶ 87.

global banking system."[63]  AML is not a shell, nor was it used for illicit purposes.

Finally, Harborne alleges that the Journal acted with actual malice, as follows:

- The Journal failed to follow journalistic ethical rules,[64] which maintain that subjects of reports should be afforded a meaningful opportunity to respond to a story before it is published.  Further, Dow Jones' own Code of Conduct, and the Journal's Newsroom Standards & Ethics rules, recognize the impact an article may have on others' lives and therefore require "assessing the credibility of our sources and providing an opportunity for full and fair comments before a piece is published."[65]

- Contrary to these policies and standards, Foldy did not provide Harborne a fair opportunity to respond.  Just two days before the March Article was published, Foldy sent an email to Harborne's AML account, requesting a comment on the article.  Based on Foldy's email to this account prior to the February Article, which "didn't send," Foldy knew the AML account was not a viable way to reach Harborne.  The

---

[63] *Id.*, ¶¶ 88-89.
[64] Such as The Society for Professional Journalists, and the Columbia Journalism Review, among others. D.I. 1, ¶ 45.
[65] *Id.*

16

Journal could have used the multiple phone numbers and email addresses listed on AML's website to contact Harborne.[66] The Journal chose not to because it "intentionally tried to avoid contacting" Harborne.[67]

- While Foldy was intentionally avoiding actual comment from Harborne, Rob Barry ("Barry"), a contributor to the March Article, was investigating Harborne's background. Barry and Foldy communicated with Harborne's former business associate, Tim Bennett ("Bennett"), to inquire about Harborne's businesses and sources of wealth. After Foldy sent Bennett a sketch of the forthcoming March Article, Bennett responded:

  > unless you are suggesting fraud or malpractice ... then it's not much of a story as he is simply yet another 'rich guy'. ... So far I see a story taking shape about a mysterious wealthy political benefactor, but I don't see any 'hooks' that will draw in your readership or indeed any investigatory/regulatory authorities.[68]

- Barry and Bennett continued to communicate, ending with Bennett telling Barry: "It seems to be your mission to try to ferret out something

---

[66] *Id.*, ¶¶ 52, 55-55.

[67] *Id.*, ¶ 56. This inference is bolstered, Harborne asserts, by a somewhat cryptic email subject line, stating only "request for comment" and no indication that it was from a news reporter or time sensitive. *Id.*, ¶ 57-58.

[68] *Id.*, ¶ 65.

that would make an otherwise mundane 'riches to massive riches' story saleable. ... But to me the [Harborne] saga is fairly uninteresting."[69]

- The Journal knew it was conveying a derogatory meaning when it implied that AML was a "shell" company because the Journal had previously published articles warning readers of the dangers of shell companies, and their use for nefarious purposes.[70]

- The Journal knew there was no basis to suggest that AML was under investigation.[71]

- The Journal knew Harborne's Thai name had been disclosed to Signature Bank, and that the account application did not request information about Harborne's investments.[72] The Journal privately admitted that Harborne's Thai name was disclosed, AML was not a shell, the Signature Bank account was not used for Tether or Bitfinex, and yet, the Journal published the article because it fit with the Journal's preconceived false narrative.[73]

In Counts II and III, Harborne and the AML plaintiffs, respectively, assert defamation by implication. The factual allegations for these counts are the same as

---

[69] *Id.*, ¶ 66.
[70] *Id.*, ¶¶ 89-93.
[71] *Id.*, ¶ 96.
[72] *Id.*, ¶¶ 97-99.
[73] *Id.*, ¶¶ 101-02.

those asserted in Count I: the statements in the March Article are defamatory, false, and made with actual malice. The defamatory statements "are of and concerning" Harborne and the AML entities, and thus they are defamatory by implication.

### III.       PROCEDURAL HISTORY

Dow Jones moved to dismiss the complaint, under Rule 12(b)(6). With its opening brief,[74] Dow Jones submitted the Transmittal Affidavit of Kevin C. Gilligan (the "Affidavit"). Exhibit 2 to the Affidavit purports to be "a true and correct copy of documents, bank records, and emails, referenced in Defendant Dow Jones & Company, Inc.'s Opening Brief in Support of its Motion to Dismiss Plaintiffs' Complaint as the 'Signature Documents.'" Exhibit 2 consists of 266 pages of various documents (or portions thereof), some of which are redacted. Dow Jones asserts that these documents are incorporated by reference into the complaint, and therefore, the Court may consider them under Rule 12(b)(6).

Prior to filing their answering brief, plaintiffs filed a motion to convert Dow Jones' motion to a motion for summary judgment and requested that it be denied as premature. Plaintiffs assert that Exhibit 2 contains unauthenticated, "never-seen-before" documents, which are not incorporated into the complaint.

At a status conference with the parties on the motion to convert, the Court asked for supplemental briefing. After reviewing the supplemental briefs, the Court

---

[74] D.I. 17.

advised the parties that the motion to dismiss and motion to convert would be heard at the same time.

The parties fully briefed the motion to dismiss and the Court held oral argument on September 17, 2024.[75]

## IV.      STANDARD OF REVIEW

The parties have not presented a fully-developed choice-of-law analysis. But because they briefed the motion to dismiss under New York law, for purposes of the motion to dismiss the Court will apply New York substantive law. The Court will apply Delaware procedural law.[76]

Under Superior Court Civil Rule 12(b)(6), the Court accepts as true all well pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. The liberal construction afforded to a claimant does not, however, "extend to 'conclusory allegations that lack specific supporting factual

---

[75] The parties filed additional supplemental submissions on October 9 and 11, 2024, addressing a recently issued Delaware defamation opinion. D.I. 61; D.I. 62. The recent Superior Court opinion denied a motion to dismiss a defamation claim. But because that case was decided under California law, it has no application here.

[76] *US Dominion, Inc. v. Fox News Network, LLC*, 2021 WL 5984265, at *18 (Del. Super. Dec. 16, 2021) (as a general matter, the law of the forum governs procedural matters).

allegations.'"[77]  Dismissal will be denied if there is a reasonably conceivable set of circumstances of recovery on the claim.[78]

"A complaint that gives fair notice 'shifts to the [opposing party] the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses.'"[79]  Therefore, to avoid dismissal under Delaware's notice pleading standard, a party "need not plead evidence," but at a minimum, must "allege facts that, if true, state a claim upon which relief can be granted."[80]

## V.    DISCUSSION

### A.    *The parties' contentions*

Dow Jones argues that the complaint must be dismissed because it fails to sufficiently plead the March Article was false.  Dow Jones makes two arguments in support of this position: (1) the complaint pleads conclusory allegations, unsupported by facts; and (2) the documents in Exhibit 2 show that the allegations

---

[77] *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at \*6 (Del. Super. Jan. 13, 2021) (citation omitted).
[78] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535, 536-37, n.13 (Del. 2011) (the "'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'").
[79] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).
[80] *Id*.

21

are not well-pled because the documents contradict the complaint's conclusory allegations.

Dow Jones also asserts that the complaint fails to sufficiently plead actual malice, again relying on the documents in Exhibit 2, in part, to support its argument.

Plaintiffs argue that the complaint contains sufficient factual allegations that the March Article was false and that it was published with actual malice. Plaintiffs further argue that the Court cannot consider the documents in Exhibit 2 on a motion to dismiss. If the Court considers the documents, plaintiffs contend that the Court must convert the motion to dismiss to a motion for summary judgment.

Before addressing whether the complaint states a claim, the Court must determine whether the Exhibit 2 documents are incorporated by reference. If Exhibit 2 is not incorporated, the Court must then decide whether to convert the motion to dismiss to a motion for summary judgment.

## B. *Incorporation by reference*

Dow Jones contends that plaintiffs allege 29 times in the complaint that the documents in the Journal's possession show that the article contained false statements.[81] According to Dow Jones, these very documents, which are contained

---

[81] *See, e.g.,* D.I. 1, ¶ 1 (asserting the article was false "even though the Journal and its reporters knew and *possessed documentation* that conclusively showed that those accusations are false."; ¶ 4 ("the *very bank account documents* that the Journal and its reporters reviewed and reported on confirmed the falsity of the Journal's accusations."); ¶ 54 ("based on the Journal's own reporting, *it possessed AML's Signature Bank application*…"); ¶ 56 ("Between AML's website and *the Signature Bank application*, the Journal knew of 13 ways in which they could contact Mr.

in Exhibit 2, contradict plaintiffs' allegations. Dow Jones argues plaintiffs cannot make allegations based on the documents upon which the Journal relied and then not incorporate them into the complaint. Dow Jones maintains that if the Court does not incorporate the Exhibit 2 documents, then the allegations that refer to documents the Journal possessed, must be stricken.[82]

Plaintiffs counter that incorporating the Exhibit 2 documents is improper because the documents are unauthenticated, redacted,[83] and plaintiffs have never seen some of these documents, which are being offered for the truth of the matter asserted. Plaintiffs assert that references in the complaint to documents in the Journal's possession are referring to plaintiffs' own documents, such as the bank application and account statements.[84] Plaintiffs further argue that it would be improper for the Court to interpret these documents at this stage of the proceedings.

### 1. *Incorporation by reference*

On a motion to dismiss, the general rule is that the "universe of facts" is those that are pled in the complaint.[85] When a party submits matters outside the complaint, a court may consider those documents, but the court then will typically convert the

---

Harborne and AML …"); ¶ 89 ("the Journal knew [the statements] were false based on its own prior reporting and the ***very documents on which it purported to report***…") (emphasis added in each).

[82] D.I. 38, p. 1.

[83] Dow Jones states that the redactions were made only to conceal its confidential source. Affidavit, ¶ 5.

[84] D.I. 39, pp. 3-4.

[85] *Doe 30's Mother v. Bradley*, 58 A.3d 429, 443 (Del. Super. 2012).

motion to a summary judgment motion.[86]  A court may consider outside matters without converting the motion to one for summary judgment in limited circumstances: "(i) where an extrinsic document is integral to a plaintiff's claim and is incorporated into the complaint by reference, and (ii) where the document is not being relied upon for the truth of its contents."[87]

Whether a document is integral to a claim is largely a "facts-and-circumstances inquiry."  Generally, a document is integral if it is the source for the facts as pleaded in the complaint.[88]  Even if a document is integral, it may not be considered unless it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document. … It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document."[89]

Courts will incorporate documents by reference for "carefully limited purposes."[90]  The court will do so to address situations such as when the complaint quotes from or relies on "only selected and misleading" portions of the document.  For example, a court may consider a proxy statement upon which a complaint's

---

[86] *Id.*

[87] *Id.*, at 444.

[88] *Murray v. Mason*, 244 A.3d 187, 192-93 (Del. Super. 2020).

[89] *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006); *Perrigo Co. v. Int'l Vitamin Corp.*, 2018 WL 4290387, at *2 (D. Del. Sept. 17, 2018) (same).  Delaware courts follow federal courts in determining whether matters outside the complaint will cause a motion to dismiss to be converted to a motion for summary judgment. *Doe 30's Mother*, 58 A.3d at 444.  *See also, Two Farms, Inc. v. Davis, Bowden & Friedel, Inc.*, 2018 WL 2714796, at *2 (Del. Super. June 4, 2018) ("Court may consider undisputedly authentic documents…").

[90] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995).

disclosure claim is based for the limited purpose of considering *what was disclosed*.[91] But, the proxy statement cannot be considered to *establish facts* in assessing the merits of the complaint's breach of fiduciary duty claims.[92]

### 2. *Analysis*

The Exhibit 2 documents have not been authenticated, as Dow Jones concedes.[93] Exhibit 2 contains some portions of AML Global Payments' Signature Bank application, some bank communications with Harborne's representatives, some internal Signature Bank communications, and bank statements that appear to relate to AML Global Payments' account at a different bank. The Affidavit does not authenticate the documents, nor could it. The record does not establish how the documents were compiled, who compiled them, or what judgment was applied in selecting these particular documents. These are factual issues that cannot be determined on a motion to dismiss.

Further, the Exhibit 2 documents *are* being offered for the truth of the matter asserted. For example, the March Article states that Signature Bank added Sakunkrit's name to a "list of names the bank felt were trying to evade anti-money-

---

[91] *Id.*

[92] *Id.* (finding lower court improperly considered the substance of the proxy statement to evaluate the complaint's substantive claims). Further examples include considering the contract at issue in a breach of contract case or the alleged defamatory article in a defamation case. *Id.*

[93] D. I. 46 (Dow Jones advising the Court that Exhibit 2 was "what we have" and that Dow Jones was not offering them "because they're authentic."); Dow Jones Reply Brief in Support of Motion to Dismiss, (D.I. 56), p. 6 (arguing that "authentication [is] irrelevant because it is not at issue.").

laundering controls."[94] Dow Jones points to an email in Exhibit 2 with a subject line of "Hotlist additions"[95] to establish that the article was accurate; Sakunkrit's name was on the Hotlist. But there is nothing in the email to indicate that the bank suspected the people/entities on the list of trying to evade the anti-money-laundering controls, as Dow Jones asserts.

Because there is a real dispute over the authenticity and relevance of the Exhibit 2 documents, the Court finds that Exhibit 2 is not incorporated into the complaint.

Next, the Court must determine whether to consider all the allegations in the complaint or, as Dow Jones urges, strike the 29 allegations that refer to the documents the Journal possessed when writing the March Article. Dow Jones argues that these allegations should be stricken because plaintiffs are now admitting that they were asserted "*without factual support*;"[96] that is, plaintiffs had no good faith basis to allege what the Journal relied on, in violation of Rule 11. [97]

At this stage of the proceedings, the Court is required to construe the allegations in the complaint in plaintiffs' favor.[98] Reviewing the complaint through

---

[94] D.I. 1, Ex. A.
[95] D.I. 18, Ex. 2, p. 4.
[96] D.I. 32, p. 2 (emphasis in original).
[97] There is no pending motion to strike or a properly raised Rule 11 violation. Therefore, the Court construes this argument as requesting the Court find that these 29 allegations are not well-pled for purposes of Dow Jones' Rule 12(b)(6) motion.
[98] *Ramunno v. Cawley*, 705 A.2d 1029, 1036 (Del. 1998).

26

this lens, the Court interprets the 29 allegations to be referring to documents of which plaintiffs were aware, such as the Signature Bank application and plaintiffs' own bank records (as well as their own behavior),[99] and not the specific documents in Exhibit 2. Thus, the Court will consider all of the allegations in the complaint.

Finally, with Exhibit 2 not being incorporated into the complaint, the Court must determine whether to consider the motion to dismiss without reference to Exhibit 2 or consider Exhibit 2 and convert it to a motion for summary judgment. The Court will not convert the motion to dismiss. Converting the motion would allow the complaint to go untested under Rule 12(b)(6). Dow Jones' motion to dismiss is not based solely on the Exhibit 2 documents and it has a right under the rule to test the complaint. So, the Court will evaluate the motion to dismiss to the extent it does not rely on Exhibit 2 documents. The Motion to Convert is **DENIED**.

C.     *Defamation*

1.     ***Elements of defamation***

"'Defamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion

---

[99] D.I. 39, p. 4.

of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'"[100]

To state a claim for defamation under New York law, a plaintiff must allege: "(i) a false statement; (ii) publication; (iii) fault; and (iv) one of four *per se* injuries, including, … (a) an accusation of a serious crime or (b) business harm [and] the alleged defamation must be 'of or concerning the plaintiff.'"[101]

Dow Jones' motion attacks the complaint's allegations of falsity and fault (here, actual malice).[102]

### 2.   *Does the complaint adequately plead the March Article is false?*

Dow Jones focuses on the article's statement that Harborne's Thai name was on a list of bank-suspected money-launders. Dow Jones asserts that the complaint fails to allege facts to show that this statement was false. First, the article does not accuse Harborne of evasive behavior but merely reports that the *bank* felt he was trying to evade such controls. Second, Harborne's denial that his name was on the

---

[100] *Zuckerbrot v. Lande*, 167 N.Y.S.3d 313, 330 (N.Y. Sup. 2022) (quoting *Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37 (1st Dept. 2014)).

[101] *US Dominion,* 2021 WL 5984265, at *21 (applying New York law) (internal citation omitted); *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (N.Y. App. Div. 1994) (internal citation omitted).

[102] Dow Jones argues that plaintiffs must plead actual malice under New York's Strategic Litigations Against Public Participation. N.Y. Civ. Rights Law § 76-a, ("Anti-SLAPP law"). Plaintiffs assert that the Anti-SLAPP law does not apply here, but concede that they must allege actual malice because they are seeking punitive damages. Even if the statute applied, plaintiffs assert that they have satisfied the actual malice pleading requirement. Accordingly, without deciding whether the Anti-SLAPP law applies, the Court will apply an actual malice standard of fault.

list is insufficient. Third, Harborne's allegation that the bank did not inform him he was on any such list and that AML was able to open an account are speculative allegations, especially because Signature Bank closed the account shortly after it was opened, with no explanation.

Finally, Dow Jones argues that the "gist" of the statement is that Harborne was on the list because of his connections to Bitfinex (which had engaged in questionable banking behavior), not that Harborne had engaged in any wrongdoing.

Plaintiffs counter that when the statements about Harborne are taken in context of the entire article, the allegations in the complaint make it reasonably conceivable that the money-laundering statement is false.[103] The "gist" of the article was that Harborne was a part of the larger scheme of "shadowy intermediaries" to commit bank fraud. Even if Dow Jones' interpretation of the gist of the article was reasonable, plaintiffs argue that at this stage of the litigation the Court must accept plaintiffs' inferences over Dow Jones'.

### i. *Falsity pleading standard*

"To satisfy the falsity element of a defamation claim, [a] plaintiff must allege that the complained of statement is 'substantially false.' Thus, '[if] an alleged defamatory statement is 'substantially true,' a claim of libel is legally insufficient

---

[103] Plaintiffs' Answering Brief in Opposition to Motion to Dismiss, (D.I. 55), p. 19.

and should be dismissed."[104] "[A] statement is substantially true if the statement would have a different effect on the mind of the reader from which the pleaded truth would have produced."[105] "'When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done.'"[106]

A statement is substantially true if the "gist" or "sting" of the article is true.[107] The Court must consider the whole article and "'its effect upon the ordinary reader.'"[108]

### ii. Analysis

The title of the March Article previews its theme: *Companies Connected to Tether Used False Documents and Shell Companies to Obtain Bank Accounts*. The article referred to "shell companies" and "shadowy intermediaries" that were used to fraudulently open the accounts. It also discussed investigations into Tether and Bitfinex transactions and other fraud in the cryptocurrency market (referencing Sam Bankman-Fried being charged with fraud). After recounting that Tether's and

---

[104] *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017) (quoting *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12 (1st Dep't 2015)).

[105] *Id.* at 242 (quoting *Biro v. Condé Nast*, 883 F. Supp.2d 441, 458 (S.D.N.Y. 2012)); *Zuckerbrot v. Lande*, 167 N.Y.S.3d 313, 333 (N.Y. Sup. 2022) ("'[c]ourts typically compare the complained of language with the alleged truth to determine whether the truth would have a different effect on the mind of the average reader.'") (internal citation omitted).

[106] *Id.* at 243 (quoting *Fleckenstein v. Friedman*, 266 N.Y. 19, 23 (1934)).

[107] *Obi v. Amoa*, 63 N.Y.S.3d 208, 216 (N.Y. Sup. 2017); *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998).

[108] *Tannerite Sports,* 864 F.3d at 243 (quoting *Silsdorf v. Levine*, 463 N.Y.S.2d 822 (1983)).

Bitfinex's accounts were closed and their later efforts to open an account at Signature Bank were "rejected," the article stated that the bankers "were then introduced to"[109] AML about opening an account. Reading the March Article as a whole, as the Court must, the "gist" is that Harborne and his company were part of this larger scheme to defraud banks. The article insinuates that Harborne intentionally hid from the bank his Thai name and his ownership interest in Tether and Bitfinex. The complaint alleges facts that the gist is not true.

The complaint alleges that Harborne followed Standard Bank's application process, provided the bank with all the information requested, including voluntarily disclosing his Thai name, and offered to provide more information if needed. Further, the Signature Bank account was used only for the stated purpose — to trade Kraken. And, the bank did not act in a manner consistent with a concern about bank fraud; it opened the account and allowed Harborne to continue to use it for a month after issuing the account closure notice.[110] Accepting Dow Jones' argument (that

---

[109] D.I. 1, ¶ 77 (emphasis added).

[110] Dow Jones relies on *Aboutaam v. Dow Jones & Co.*, 2019 WL 1359772 (N.Y. Sup. Mar. 26, 2019) and *Cabello-Rondón v. Dow Jones & Co.*, 2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017) to support its argument that mere denial of the allegations is insufficient to plead falsity. In *Aboutaam*, the plaintiff did not challenge the article's statement that the family's company was under international investigations, but only challenged the statement that the company was under investigation by U.S. Immigration and Customs Enforcement. The complaint alleged the article was false because it did not include a statement that the owners of the company "disclaimed any knowledge" of the investigations. This allegation did not provide facts that there were no such investigations and therefore, the mere denial was insufficient. In *Cabello-Rondón*, the plaintiff challenged the statement that he was the "biggest target" or a "leading target" of an investigation but did not challenge that he in fact was the subject of an investigation. The plaintiff pled no facts to show the article was false but instead relied on a "conclusory and convoluted statement" in the

Signature Bank closing the account without explanation only a few months after it was opened shows it was concerned about fraud), would require construing the allegations in Dow Jones' favor, which the Court cannot do on a motion to dismiss.

Plaintiffs also alleges facts that AML was not a shell and that Harborne was not an executive of Bitfinex or Tether.

Finally, Dow Jones' assertion that the gist of the statement that Harborne's Thai name was put on the bank's list was simply due to Harborne's connections to Bitfinex (and not because of any alleged wrongdoing), is not a reasonable reading of the March Article. The article expressly said that the Sakunkrit name was put on the list due to concerns over money-laundering.

The Court finds that the effect of the March Article on the ordinary reader would be that Harborne and his companies were involved in the fraudulent schemes. The complaint alleges facts sufficient to plead that the article was false.

### 3. *Does the complaint adequately plead actual malice?*

Dow Jones contends that the complaint's actual malice allegations are insufficient as a matter of law: the complaint does not identify the alleged unreliable source the Journal relied on; its theory of shoehorning Harborne into a preconceived

---

complaint. These cases are distinguishable. First, they subject the complaints to a higher pleading standard. *Aboutaam* (requiring defamation to be pled with particularity) and *Cabello-Rondón* (applying plausibility standard). Second, unlike these cases, plaintiffs here allege more than a bare statement that the article was false.

32

narrative about Bitfinex is belied by the fact that he is one of Bitfinex's largest stockholders; the March Article never called AML a "shell company;" pointing to Bennett, who provided no substantive comment on Harborne except to call him "yet another 'rich guy,'" is insufficient; an alleged lack of investigation is insufficient to find actual malice; and the refusal to retract cannot establish actual malice because the relevant time period is at publication, not after.

Plaintiffs counter that they have alleged direct evidence of actual malice: the Journal intentionally omitted that Harborne did not hide his Thai name from Signature Bank; and the Journal knew AML Global was not a shell, as established by the February Article.

Plaintiffs also assert that they have alleged circumstantial evidence of actual malice: the Journal purposefully avoided the truth because it did not use any of the other 13 available methods to contact Harborne for comment, and it ignored Bennett's comments that the story's tact had no traction; the Journal relied on an anonymous source without further investigation; the Journal "fit" Harborne into its preconceived false narrative that Harborne was part of Bitfinex's and Tether's unlawful schemes; the Journal refused to retract the March Article from all its sites and failed to publicly publish that it did not intend to insinuate that Harborne had done anything wrong; and the Journal violated journalistic standards, evidenced by,

33

among other things, the Journal's admission that the March Article "did not meet" its own "editorial standards."

### i. *Actual malice pleading standard*

Actual malice is the most demanding fault standard.[111] It does not mean ill will or animosity.[112] Rather, a plaintiff must show that the defendant published the false information about the plaintiff "'with knowledge that it was false or with reckless disregard of whether it was false or not.'"[113] To demonstrate "reckless disregard," a plaintiff must establish that the defendant "entertained serious doubts as to the truth of [the] publication or ... had a high degree of awareness [of its] falsity."[114] The meaning of "reckless disregard" is not "readily captured in 'one infallible definition,'"[115] but "through the course of a case-by-case adjudication," courts have given context to this "otherwise elusive constitutional standard[]."[116]

Caselaw teaches that reliance on an anonymous source or an unreliable source, alone, "does not support an inference of actual malice."[117] Similarly, the failure to investigate a statement's truth, alone, does not support an inference of actual malice,

---

[111] *US Dominion*, 2021 WL 5984265, at *28.
[112] *Cabello-Rondon v. Dow Jones & Co., Inc.*, 720 Fed.Appx. 87, 88 (S.D.N.Y. 2018).
[113] *US Dominion,* 2021 WL 5984265, at *28 (citing *Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 647 N.E.2d 101, 104 (N.Y. 1995) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964))) (cleaned up).
[114] *Id.*; *Cabello-Rondon,* 720 Fed.Appx. at 88 (quoting *Church of Scientology Int'l v. Behar,* 238 F.3d 168, 174 (2d Cir. 2001)).
[115] *Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 686 (1989) (citation omitted).
[116] *Id.*
[117] *Cabello-Rondon,* 720 Fed.Appx., at 89.

"even if a prudent person would have investigated before publishing the statement."[118] But reliance on an anonymous or unreliable source without further investigation *may* support an inference of actual malice.[119]

Further, a publisher cannot "'purposefully avoid[ ]' the truth and then claim ignorance. If the plaintiff offers 'some direct evidence' that the statement 'was probably false,' the court can infer that the defendant 'inten[ded] to avoid the truth.'"[120]

"The hurdles to … pleading actual malice, though significant given the First Amendment interests at stake, are by no means insurmountable."[121] "'Although actual malice is subjective, a court typically will infer actual malice from objective facts,' understanding that a defendant in a defamation action will rarely admit that he published the relevant statements with actual malice."[122] Such circumstantial evidence of actual malice may include a departure from journalistic standards,[123] a preconceived false narrative,[124] and a refusal to retract.[125]

---

[118] *US Dominion*, 2021 WL 5984265, at *21 (citing *Sweeney*, 647 N.E.2d, at 104 (quoting *N.Y. Times Co.,* 376 U.S., at 280)) (cleaned up).
[119] *Cabello-Rondon*, 720 Fed.Appx., at 89.
[120] *US Dominion*, 2021 WL 5984265, at *21.
[121] *Biro v. Condé Nast*, 807 F.3d 541, 545 (2d Cir. 2015) (citation omitted).
[122] *Id.*
[123] *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1043 (Del. Super. 2023) ("*US Dominion II*") (citing *Harte-Hanks Comm.,* 491 U.S., at 689 (1989)).
[124] *Id.*
[125] *Id*.

### ii. Analysis

Plaintiffs argue that they cannot be faulted for failing to provide factual allegations challenging the veracity of the Journal's source (because the Journal refused to provide any information about the source) and therefore, they should be entitled to proceed to discovery on this issue. This argument fails for several reasons. First, the source is not anonymous; it is confidential – the Journal knows the identity of the source. Second, it is inconsistent with "actual malice" being a subjective test.[126] That plaintiffs do not know the identity of the source does nothing to show that the *authors* "in fact entertained serious doubts as to the truth of the publication."[127] Finally, even if the source was anonymous, that fact alone is insufficient. Reliance on an anonymous source may be evidence of actual malice "when there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[128] Plaintiffs offer no factual support for the notion that the authors of the March Article had reason to doubt their source's information.

Similarly, plaintiffs' theory that the Journal purposely avoided the truth is insufficient. The Journal's reporter admitted that his February email to Harborne's

---

[126] *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996 ) ("The actual malice standard is subjective…" and therefore, "the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication.").

[127] *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

[128] *Id. See also, Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157 (1967) (publisher had reason to question veracity of its source, who was on probation for bad check writing charges, but published the story without substantial independent support).

AML account "didn't send,"[129] but Harborne does not allege that he never received the March 1 email. Moreover, failing to obtain a comment from the subject of an article is not evidence of actual malice.[130] There is no obligation for a reporter to try to find or use multiple means to contact a subject, and plaintiffs cite no authority for such a proposition.[131]

While it is a close call, plaintiffs' remaining allegations, taken together, adequately plead actual malice.

*Direct evidence*: Plaintiffs allege that the March Article insinuated that Harborne hid his Thai name from Signature Bank, but the Journal possessed Signature Bank documents that showed that the Thai name was disclosed. Also, the Journal knew from previous reporting that AML was a jet fuel company with significant contracts, not a shell. Dow Jones responds that the March Article never called AML a "shell" company. But a fair reading at this stage is that the article suggested that AML was a shell.

---

[129] As Dow Jones points out, the February email "didn't send", which suggests the email never left the sender's outbox. It does not suggest that there was any defect in the email address or that the email was otherwise undeliverable.

[130] *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510-11 (D.C. Cir. 1996) (quoting *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)) (the reporter could reasonably expect the subject of the story to deny the allegations and "[S]uch denial are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.").

[131] Plaintiffs also argue that the Journal's failure to obtain a comment from Harborne violates its own journalistic standard. But the standards cited by plaintiffs do not suggest that the multiple contact avenues must be utilized.

*Preconceived narrative*: The throughline of the March Article was Bitfinex's and Tether's scheme to defraud banks. The Journal sought to further that narrative by implicating Harborne. The reporters contacted Bennett, but did not follow through after Bennett indicated that his information would not be helpful to the story the Journal wanted to tell.

Despite no Bitfinex transactions in AML Global Payment's Signature Bank account, the March Article included a quote from "[c]ompliance executives" suggesting that Bitfinex transactions had been flowing through the account.

To "fit" Harborne into Bitfinex's scheme, the article stated that "Harborne is one of Bitfinex's largest shareholders," despite the fact that he had no control over the company and never held any positions with the company.

*Refusal to retract*: While the Journal removed the Last Five Paragraphs of the article from its online version, its other sites still carry the full article.[132]

*Departure from Journalistic standards*: The Journal admitted that the March Article was not up to its editorial standards.

## VI.   CONCLUSION

Reading the March Article as a whole, the gist of the story is that Harborne and his company were part of a broader scheme by Bitfinex and Tether to defraud

---

[132] *US Dominion II,* 293 A.3d, at 1043 (where a refusal to retract may be considered as circumstantial evidence of actual malice).

Signature Bank. Accepting plaintiffs' well pled allegations as true, the complaint adequately alleges the March Article was false.

It remains to be seen whether plaintiffs will be able to carry their burden at trial to prove that the authors acted with actual malice. But plaintiffs are not required to plead evidence at this stage of the case. The complaint adequately pleads actual malice.

Accordingly, the Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED**.

*/s/Kathleen M. Miller*
Kathleen M. Miller, Judge